365 F.2d 28
 BANKERS LIFE AND CASUALTY COMPANY, a corporation, Plaintiff-Appellee,
v.
GUARANTEE RESERVE LIFE INSURANCE COMPANY OF HAMMOND, a
corporation, andNational Protective Life Insurance
Co., a corporation, Defendants-Appellants.
 No. 15368.
 United States Court of Appeals Seventh Circuit.
 June 17, 1966, Rehearing Denied Aug. 4, 1966.
 
 Claude A. Roth, Charles D. Stein, Noel Kaplan, Chicago, Ill., Gottlieb & Schwartz, Chicago, Ill., of counsel, for appellants.
 Charles F. Short, Jr., Chicago, Ill., Brundage & Short, Chicago, Ill., of counsel, for appellee.
 Before KNOCH, CASTLE and SWYGERT, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 Bankers Life and Casualty Company, an Illinois corporation with its principal office in Chicago, brought this diversity action against Guarantee Reserve Life Insurance Company of Hammond and National Protective Life Insurance Company, Indiana corporations with their principal offices in Hammond, Indiana.[1] Both the plaintiff and the defendants are engaged in the sale of accident, health, and life insurance. Bankers' three-count complaint charged essentially that Guarantee and National wrongfully obtained and used a quantity of IBM cards containing the names of Bankers' policyholders. After a trial without a jury, the district court entered findings of fact and conclusions of law favorable to Bankers and rendered judgment in its favor on all counts of the complaint. The court assessed $400,000 as compensatory damages and $400,000 as punitive damages. Guarantee and National have appealed, challenging the district court's findings both as to liability and the amount of damages. We have concluded that certain critical findings underlying Bankers' right to recover are clearly erroneous-- in substance, that Bankers failed to prove its case.
 
 
 2
 The evidence introduced at the trial, taken in the light most favorable to Bankers, tended to show the following.
 
 
 3
 Richard M. Seidel is the son-in-law of Ben Jaffe who, with his family, owned a seventy-three per cent interest in Guarantee. During 1957 and 1958, Seidel held stock in Guarantee and was a trustee of other Guarantee stock owned by the members of his family. In October 1957, Seidel became one of the incorporators, a director, and the secretary of National. He became an officer of Guarantee and an employee of both Guarantee and National in January 1958.
 
 
 4
 Prior to that time, since 1949, Seidel had also been a mailing list dealer or broker in Chicago. In that capacity in 1957 he schedualed mailing lists for Guarantee, substantially at this own discretion. At that time Seidel also shared an office with Rapid Mailing and Advertising Company which was purchased by Guarantee in the latter part of 1957 and moved to Hammond, Indiana.
 
 
 5
 At the trial Seidel, called as an adverse witness, testified that early in 1957 he was approached by a man who said his name was John Thompson and who offered approximately 150,000 IBM punch cards for sale. Each card had a name and address stamped on it, together with a series of dates and figures. On some of the cards, the word 'lapsed' was also present. Seidel stated that, after testing the names by sending Guarantee literature to 5,000 of the addresses and receiving a satisfactory percentage response, he purchased the cards for $10 per thousand. He testified that he paid $1,500 for the cards and that Thompson insisted on being paid in cash. Seidel added that although he learned nothing from Thompson at first about the source of the cards othere than that they had been used by an insurance company, he ultimately was told that the cards had come from Bankers and that Thompson had purchased them from a scrap dealer who was responsible for sweeping the offices of Bankers.
 
 
 6
 At this point it should be noted that Alan Drey, the vice president in charge of the Chicago office of a New York concern in the mailing list and direct mailing business, also testified that a man who gave the name of Thompson contacted him sometime around 1957 or 1958 in an effort to rent him 'several hundred thousand' IBM-type punch cards with names and addresses on them and which had allegedly been used by an insurance company.
 
 
 7
 Next, according to Seidel's testimony, he arranged to have the names on the IBM cards typed onto a list by employees of Rapid Mailing, from which list two sets of labels were prepared. He then destroyed the cards. One set of labels was rented to Guarantee during 1957 at $15 per thousand names for solicitation of insurance by mail. The second set of labels was retained at Rapid Mailing and was delivered to Guarantee when Rapid Mailing was purchased and moved to Hammond, Indiana. These labels were used to solicit insurance for National early in 1958.
 
 
 8
 During 1956 and 1957, Bankers used a three-part IBM card system for the purpose of notice and collection of premiums, rather than the premium history card system traditionally employed by insurance companies. Under Bankers' system, two parts of the IBM card were went to the policyholder, one part to be retained by him and the second part, the 'premium notice' card,[2] to be returned with his premium check. The third part, known as a 'status card,' was retained in Bankers' accounts receivable file. The status card did not bear Bankers' name. It contained only premium payment information and the name and address of the policyholder. When a premium was paid and the premium notice card was returned to Bankers, the premium notice card was matched against the accounts receivable file and then filed in a separate room for state examination purposes. A 'paid to' date was punched into the status card, the status card was placed in an 'active status' file, and the old status card was removed from this file and discarded. Status cards were similarly discarded after a certain grace period upon nonpayment of the premium.
 
 
 9
 In the early part of 1958, after he had taken charge of direct mail soliciations for Guarantee and National. (and while Rapid Mailing was in the process of moving to Hammond), Seidel employed Mailers, Inc. of Chicago to handle the mailing of several million pieces of literature. An employee of Mailers, Inc. testified that Guarantee provided his firm with groups of addressed labels together with matching code numbers to identify the mailings. During January and February 1958, Mailers, Inc. either mailed or labeled and delivered to Guarantee and National approximately 1,500,000 envelopes corresponding with doce numbers which included the figure '2729.' The invocies covering this work showed that several mailings in varying quantities were actually involved and that the number '2729,' common to this group of mailings, occasionally appeared alone but more often appeared with letter prefixes and suffixes.[3] The Mailers, Inc. employee testified that the code number '2729' represented a single list and that the letter prefixes and suffixes merely indicated portions of the master list. He stated that he knew this because of his dealings with employees of Guarantee over the years. He admitted on cross-examination, however, that he had no knowledge as to the source of any names or lists of names provided by Guarantee, and that the code number '2729' with its prefixes and suffixes could have represented a miscellaneous series of lists.
 
 
 10
 Four pieces of mail sent by Mailers, Inc. on behalf of National were introduced into evidence. These solicitations were received by three policyholders of Bankers, who also happened to be either agents or employees of Bankers. The names and addresses on the envelopes contained certain peculiarities or minor errors which corresponded precisely with those contained on the records of Bankers and on premium billings sent by Bankers to the same policyholders. Three of these solicitations bore the code number 'H2729S' on the application for insurance contained inside the envelopes; the other bore the code number 'H2729Y.'[4] The similarities in addressing were reported to Bankers. John MacArthur, the president of Bankers, subsequently arranged a meeting with Jaffe and Seidel, held in December 1958.
 
 
 11
 MacArthur testified that the meeting with Jaffe and Seidel was designed to reach some sort of settlement. He testified that Jaffe told him that he, Jaffe, would have had nothing to do with using the names of Bankers' policyholkers if he had been in town or known about it. MacArthur said that Jaffe assured him that 'he would assist me by telling me the name of our employee who had sold the list to his son-in-law.' He quoted Jaffe as stating, 'I don't blame Seidel for not wanting to tell, because you don't rat on people.' Negotiations for a settlement broke doen, however, and MacArthur testified that in a subsequent conversation with Jaffe, the latter said, 'Well, it was your junkman who hauls away your waste paper, he is the fellow my son-in-law bought it from.' MacArthur added, 'I told him that I was sure that was a cock-in-bull story for the reason that the names, the cards that disappeared, were the cards that we had to store so the insurance examiners could verify our premium income and * * * we had stored them in the room. Somebody had located the missing cards from this room. I told Ben Jaffe that no junkdealer would have access to the room. * * *'
 
 
 12
 MacArthur's testimony contained the only reference to missing IBM cards by anyone connected with Bankers. MacArthur himself admitted that he had no firsthand knowledge of any of the details, that all his information had come through his subordinates. Other executives of Bankers testified, but they all disavowed any personal knowledge of missing cards. Bart T. Murphy, who was Bankers' director of data processing during the relevant period, stated that he never found nay cards missing. He also testified that that part of the IBM cards no longer needed for maintenance of the company's filing and record system 'was forwarded to Maintenance to be destroyed.'
 
 
 13
 Based upon the foregoing evidence, the district court found that Guarantee and National 'clandestinely' obtained possession of 1,500,000 cards containing the names and addresses of Bankers' policyholders, which cards were 'maintained (by Bankers) * * * to facilitate the sending * * * of renewal notices on its various policies, as well as to maintain a record disclosing whether the policy was in force.' The court found that the cards were obtained without Bankers' knowledge or consent and with knowledge that they were owned by Bankers, and that the defendants' conduct was wilful, wanton, and malicious.[5]
 
 
 14
 In order to properly assess the district court's conclusion that Guarantee and National unlawfully misappropriated Bankers's property, it is necessary to recite briefly the claim which the plaintiff asserted. Count one of the complaint was based on a Illinois criminal statute which related to the use of a list or compilation of names obtained from the possession or control of its lawful owner without his consent.[6] Court two charged Guarantee and National with conversion, and count three charged that they conspired with each other and with persons unknown to obtain the cards bearing the names of Bankers' policyholders.[7] Thus the central allegation was that the defendants wrongfully appropriated and used cards owned by Bankers and to which Bankers had a present right to possession. Bankers' right to recover under the cited Illinois statute, assuming without deciding that the statute created a civil cause of action, was necessarily predicated upon Bankers' ownership and possession of the cards which found their way into Seidel's hands. Similarly, in order to maintain its common law action for conversion, Bankers was required to establish that it was in possession and control of the cards or entitled to their possession at the time of the conversion. Lee Woodworking Co. v. Hub Plating Works, Inc., 217 F.2d 453 (7th Cir. 1954).
 
 
 15
 The record discloses that Seidel obtained a number of IBM punch cards which had originally been in Bankers' files.[8] But the crucial question, unanswered by the evidence, is whether Bankers was in possession of the cards or was entitled to possession of them at the time when Seidel acquired them. Banker failed to establish which cards, if any, were missing or, stated differently, that the cards which Seidel acquired were cards to which Bankers was entitled to possesion. Despite MacArthur's equivocal testimony that cards which 'we had to store so the insurance examiner would verify our premium notice' (cards with Bankers' name on them) were missing, there seems to be no question that the cards Seidel obtained were the third-part status cards of the type which did not contain Bankers' name and which, after being used to initiate new premium notices, were discarded. MacArthur's testimony about missing cards were admittedly hearsay and was not supported by the subordinates upon whom he relied for his information. Bankers' employee in charge of data processing, for example, had no knowledge of missing cards, On the other hand, the same employee testified that as a general practice status cards, after having served their purpose, were 'forwarded to Maintenance to be destroyed.'
 
 
 16
 Thus we are left with a void as to the history of the cards in question between the time they were in Bankers' files until they appeared in Seidel's possession, except for Seidel's testimony that he bought them form a man named Thompson. MacArthur's hearsay testimony about 'missing' cards, never shown to have been missing by any other evidence, cannot serve as a substitute for proof of the loss and tracing to Seidel of identifiable property to which Bankers had a right to possession. No witnesses were produced to account for the disposition of Bankers' discraded status cards. We are left to speculate whether those acquired by Seidel were abandoned by Bankers and retrieved by an unknown third person, were swept up by Bankers' trash collector and salvaged, or were stolen by an employee of Bankers from its files.
 
 
 17
 The district Judge made what we consider an impermissible inference to supply the missing link in Bankers' chain of evidence. First, the judge concluded, as he might, that Seidel was an unreliable witness who could not be believed and that MacArthur was a credible witness. Then, however, based upon his disbelief of Seidel's story and upon his crediting of MacArthur's testimony, the judge found that Seidel wrongfully appropriated property owned by Bankers. The latter inference was improper. As was suggested, MacArthur's hearsay testimony does not satisfy the lack of affirmative proof, direct or circumstantial, of a wrongful appropriation of Bankers' property. Nor can Bankers' right to recover be based upon the discrediting of Seidel's testimony, however implausible it may appear. The disbelief of Seidel's testimony cannot support an affirmative finding that the reverse of his testimony is true, that is, it cannot supply a want of proof. Moore v. Chesapeake & O. Ry., 340 U.S. 573, 576, 71 S.Ct. 428, 95 L.Ed. 547 (1951); Eckenrode v. Pennsylvania R.R., 164 F.2d 996, 999 (3d Cir. 1947).
 
 
 18
 Since we are convinced that the distirct court's findings essential to liability are clearly erroneous, we do not reach the other troublesome questions relating to damages.
 
 
 19
 The judgment is reversed.
 
 
 
 [1]
 National, organized as a wholly owned subsidiary of Guarantee, was merged into Guarantee in 1964
 
 
 [2]
 Premium notice cards contained the words 'premium notice' and 'Bankers Life and Casualty Co.' in bold type on their face
 
 
 [3]
 For example, one invoice showed a mailing of 419,644 under the number '2729,' while another invoice showed a mailing of 61,035 under the designation 'H2729G,' and a third invoice showed a mailing of 50,121 under the designation 'H2729T.'
 
 
 [4]
 The Mailers, Inc. invoce under the code number 'H2729S' shows a mailing of 80,641 envelopes. No invoice bearing the designation 'H2729Y' was introduced
 
 
 [5]
 The relevant portions of the court's findings read:
 The defendants and their officers and agents clandestinely obtained possession of 1,500,000 of said cards; used the names and addresses contained thereon for solicitation of insurance for their respective companies and then destroyed said cards, all of which was done without the knowledge and consent of the plaintiff. Said conduct on the part of the defendants, their officers and agents, was done with full knowledge of the ownership by plaintiff, and was wilfull, wanton and malicious with the intent to appropriate for their own use said property of the plaintiff. * * *
 The officers and agents of the defendants did conspire with each other and with another person or persons in order to obtain the afore-described cards and the information contained therein for their own use. * * *
 Richard Seidel, an officer of each defendant, is a completely unreliable witness and the court cannot believe him; thus there is no dispute or substantial dispute with John MacArthur's testimony, and the court finds him to be a credible witness. * * *
 Richard Seidel was, at all times alleged in the Complaint, the son-in-law and under the control and domination of Ben Jaffe. * * *
 
 
 [6]
 Relevant parts of this statute, in effect at the time the complaint was filed but since repealed, read:
 179a. Any person having or obtaining access * * * to any list, compilation or other collection of * * * names * * * in the possession or control of the lawful owner and used in connection with any lawful business * * * and who * * * shall take possession of any such list * * * or shall make or cause to be made * * * a copy or duplication thereof * * * shall be guilty of a misdemeanor * * *. 179b. Any person who may * * * obtain any such list, compilation or other collection * * * or any copy or duplication of such list * * * or the information contained in any such list * * * and who, without the consent of the lawful owner of any such list * * * and with notice or knowledge of his rights, may * * * make use of or attempt to make use of any such list * * * for his own benefit or advantage * * * shall be guilty of a misdemeanor * * *. 179c. Any person, who with knowledge or notice of the right of the lawful owner of any such list, compilation or other collection * * * shall aid, abet or incite any other person to do any act specified in section 179a or 179b hereof, shall be guilty of a misdemeanor * * *. (Ill.Laws 1925, pp. 341-342.)
 
 
 [7]
 The conspiracy count will not be discussed except to note that the record contains no evidence which would support a finding of conspiracy among the officers, directors, and agents of the defendant corporations. The district court's finding of conspiracy appears to have been predicated upon Jaffe's 'domination' of Seidel and the affairs of Guarantee and National. 'Domination' of itself is insufficient to show the concerted action and common design essential to a conspiracy
 
 
 [8]
 If Seidel's testimony is credited, he acquired 150,000 cards. If his testimony is rejected and the testimony of Alan Drey, who suggested that Thompson had offered 'several hundred thousand' cards for sale, is disregarded, the conclusion that Seidel came into possession of 1,500,000 cards containing the names of Bankers' policyholders can be reached only through a series of tenuous inferences. (Bankers 'proved' the number of its policyholders in 1956 and 1957 by offering the testimony of a vice president who stated that Bankers had 'about 1,500,000, in round numbers.') First, the employee of Mailers, Inc. who stated that the code number '2729' represented a single list of names must be credited even though he admittedly had no knowledge of the source of list provided by Guarantee. Next, the letter prefixes and suffixed must be accepted as merely indicating portions of the same list, even though (1) one invoice (one of two identified by the number '2729' without letter prefixes or suffixes and covering a mailing of 419,644 pieces) affirmatively appeared to contain a complete circularization of all the states; (2) three of the four pieces of mail received by Bankers' policyholders and introduced into evidence bore the notation 'H2729S,' part of a mailing of 50,641; and (3) the fourth item contained a key number not specifically identified by or related to any invoice of Mailers, Inc. Finally, the eight invoices of Mailers, Inc. introduced by Bankers, representing the processing of approximately 1,500,000 envelopes in varying quantities over a two-month period, must be accepted as identifying 1,500,000 different names, each circularized once